RACHELE R. BYRD (190634)
byrd@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

*Attorneys for Plaintiffs*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| ELIZABETH GENDRON and ROGER CARTER, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION, a Japan corporation, TOYOTA MOTOR NORTH AMERICA, INC., a California corporation, TOYOTA MOTOR SALES, USA, INC., a California corporation, TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., a Kentucky corporation, DENSO CORPORATION, a Japan corporation, and DENSO INTERNATIONAL AMERICA, INC., a Delaware corporation,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **VIOLATION OF CAL. CIV. CODE §§ 1750,** *et seq.***;**<br>2. **VIOLATION OF CAL. CIV. CODE §§ 1790,** *et seq.***;**<br>3. **VIOLATION OF CAL. BUS. & PROF. CODE §§ 17500,** *et seq.***;**<br>4. **VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200,** *et seq.***;**<br>5. **NEGLIGENCE; AND**<br>6. **VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT, 25 U.S.C. §§ 2301,** *et seq.*<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Elizabeth Gendron and Roger Carter ("Plaintiffs") bring this class action on behalf of themselves and all others similarly situated against defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, USA, Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively "Toyota"); and Denso Corporation and Denso International America, Inc. (collectively, "Denso").[1]  Based on personal knowledge as to matters relating to themselves and their own actions, and on information and belief as to all other matters based on the investigation of counsel, including counsel's review of consumer complaints available on the database of the National Highway Transportation Safety Administration ("NHTSA") and other publicly available information, Plaintiffs allege as follows:

## INTRODUCTION

1.     On January 13, 2020, Toyota submitted a defect information report to NHTSA (the "First DIR")[2] announcing the voluntary recall (Recall 20V-012) (the "Recall") of 695,541 Toyota and Lexus vehicles[3] equipped with defective Denso low-pressure fuel pumps.  Toyota identified a dangerous defect in the low-pressure fuel pump which can fail and cause the vehicles identified in the Recall to unexpectedly stall and suffer engine shut down:

---

[1]     Toyota and Denso are collectively referred to herein as "Defendants."

[2]     The First DIR is attached hereto as Exhibit A.

[3]     This Recall included the following vehicles:  2018-2019 Toyota 4Runner, 2019 Toyota Avalon, 2018-2019 Toyota Camry, 2019 Toyota Corolla, 2018-2019 Toyota Highlander, 2018-2019 Toyota Land Cruiser, 2018-2019 Toyota Sequoia, 2018-2019 Toyota Sienna, 2018-2019 Toyota Tacoma, 2018-2019 Toyota Tundra, 2019 Lexus ES, 2018-2019 Lexus GS, 2018-2019 Lexus GX, 2018-2019 Lexus IS, 2018-2019 Lexus LC, 2018-2019 Lexus LS, 2018-2019 Lexus LX, 2019 Lexus NX, 2018-2019 Lexus RC, 2018-2019 Lexus RX.

The subject vehicles are equipped with a low-pressure fuel pump, located in the fuel tank[ ] that supplies fuel pressure to the fuel injection system. These fuel pumps contain an impeller that could deform due to excessive fuel absorption. … Although the cause is unknown, if impeller deformation occurs, the impeller may interfere with the fuel pump body, and this could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall [("Fuel Pump Defect")] ….

2.      Defendants designed, engineered, tested, validated, manufactured, and placed Denso low-pressure fuel pumps with the defective impeller into the stream of commerce.

3.      As far back as 2016, Defendants knew that impellers in Denso fuel pumps, due to their composite material, "may be swelled due to the fuel and water contained in the fuel, therefore a rotation of the impeller may be stopped when the impeller is swelled and comes in contact with the [fuel pump] housing," and sought a fix for this issue.[4]

4.      As stated in the First DIR, however, Defendants began an investigation of the defect in Denso low-pressure fuel pumps in mid June 2019 following an observed increase in field reports:

In mid-June, Toyota began an investigation, including the recovery of failed parts from the field. The supplier [(Denso)] began inspection and analysis of the recovered parts and identified impeller deformation inside the fuel pump assembly due to more fuel

---

[4]      U.S. Patent Application No. 15767375, *Impeller for Fuel Pump*, (application date Oct. 26, 2016) (Denso Corporation, et al. applicants), *available at* https://patentscope.wipo.int/search/en/detail.jsf?docId=US231859533 (last visited April 19, 2020).

absorption into the impeller material, with signs of binding/interference between the pump impeller and the pump casing/cover.  A further analysis of failed impellers was conducted and it was confirmed that the failed impellers had a lower density. Generally, impellers with lower density are more susceptible to fuel absorption.

As part of ongoing parts analysis, an additional observation was made of cracking to the impeller surface. To understand the relationship between surface cracks and pump failure, Toyota began an investigation to identify factors potentially contributing to cracking.

5.      As of January 7, 2020, there were 66 Toyota Field Technical Reports and 2,571 warranty claims received by Toyota from U.S. sources that relate to the Fuel Pump Defect.[5]

6.      Defendants, however, were well aware of the Fuel Pump Defect long before their claimed initiation of the investigation in June 2019.

7.      In a March 4, 2020 press release, Toyota Australia disclosed the recall of 45,683 vehicles with defective Denso low-pressure fuel pumps, stating: "This is *the same issue as the recall initiated in North America in January 2020*. After further investigation, *we are now initiating a global recall and adjusting the scope of affected vehicles in North America*."[6]  The same press release also discloses that Defendants *changed the production process for Denso low-pressure fuel pumps in April 2019*:

Q3. What does the remedy involve?

A3. For all involved vehicles, Toyota dealers will replace the low-

---

[5]     *See* Exhibit A.

[6]     The March 4, 2020 press release is attached hereto as Exhibit B.

pressure fuel pump with an improved one free of charge to customers. …

Q5. ***What was the improvement made to the fuel pump?***

A5. ***In April 2019, the production process was changed so that the fuel pump impellers were improved***.[7]

8.    On March 4, 2020, Toyota submitted an amended defect information report to NHTSA (the "Second DIR"), expanding the Recall from 695,541 to 1,817,969 of its most popular Toyota and Lexus vehicles.[8]  In the Second DIR,[9] Toyota states that the additional 1,122,428 vehicles have the same Fuel Pump Defect:

> The subject vehicles are equipped with a low-pressure fuel pump, located in the fuel tank[ ] that supplies fuel pressure to the fuel injection system. These fuel pumps may include impellers which have been manufactured with lower density. If these impellers are also (1) of a type with lower surface strength or (2) of a different type but were exposed to production solvent drying for longer periods of time,

---

[7]    *Id*. (emphasis added).

[8]    This amended Recall included the following vehicles:  2014-2015 Toyota 4Runner, 2018-2019 Toyota Avalon, 2018-2019 Toyota Camry, 2018-2019 Toyota Corolla, 2014 Toyota FJ Cruiser, 2018-2019 Toyota Highlander, 2014-2015 Toyota Land Cruiser, 2018-2019 Toyota Sequoia, 2017-2019 Toyota Sienna, 2018-2019 Toyota Tacoma, 2018-2019 Toyota Tundra, 2018-2019 Lexus ES350, 2018-2019 Lexus GS300, 2013-2014 and 2018-2019 Lexus GS350, 2014-2015 Lexus GX460, 2014 Lexus IS-F, 2017 Lexus IS200t, 2018-2019 Lexus IS300, 2014-2015 and 2018-2019 Lexus IS350, 2018-2019 Lexus LC500, 2018-2019 Lexus LC500h (Hybrid), 2013-2015 Lexus LS460, 2018-2019 Lexus LS500, 2018-2019 Lexus LS500h (Hybrid), 2014-2015 Lexus LX570, 2015 Lexus NX200t, 2018-2019 Lexus RC300, 2017 Lexus RC200t, 2015 and 2018-2019 Lexus RC350, 2017-2019 Lexus RX350, and 2018-2019 Lexus RX350L.

[9]    The Second DIR is attached hereto as Exhibit C.

higher levels of surface cracking may occur. In this condition, excessive fuel absorption may occur, resulting in increased impeller deformation. In some cases, the impeller may deform to a point that creates sufficient interference with the fuel pump body to cause the fuel pump to become inoperative. An inoperative fuel pump due to these conditions could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall while driving at low speed. However, in rare instances, vehicle stall could occur while driving at higher speeds, increasing the risk of a crash.[10]

9.    As of March 2020, there were 73 Toyota Field Technical Reports and 3,358 warranty claims received by Toyota from U.S. sources that relate to the Fuel Pump Defect.

10.    On a global basis, Toyota recalled 3.2 million vehicles in connection with the Fuel Pump Defect.[11]

11.    On March 19, 2020, Toyota submitted another amended defect information report to NHTSA (the "Third DIR"),[12] further expanding the Recall to include 1,830,752 Toyota and Lexus vehicles.[13]

---

[10]    *See* Exhibit C.

[11]    *See* Chester Dawson, *Toyota Recalls 3.2 Million Vehicles Globally to Fix Fuel Pumps*, Bloomberg.com, Mar. 4, 2020, *available at* https://www.bloomberg.com/news/articles/2020-03-04/toyota-recalls-3-2-million-vehicles-globally-to-fix-fuel-pumps (last visited April 17, 2020)

[12]    The Third DIR is attached as Exhibit D.  The First DIR, Second DIR, and Third DIR are collectively referred to herein as the "DIRs."

[13]    The Third DIR expanded the number of Lexus GS vehicles subject to the Recall to include 2018-19 Lexus GS300 vehicles produced from October 13, 2017 through January 18, 2019, and 2013-2015 and 2018-19 Lexus GS350 vehicles

12.     The Recall captures only a portion of 2013-2019 Toyota and Lexus vehicles equipped with Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefixes 23220- and 23221-.  However, the same dangerous condition is present in all 2013-2019 Toyota and Lexus vehicles equipped with Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefixes 23220- and 23221- ("Class Vehicles").  For example, Toyota submitted the Third DIR to NHTSA in order to add another 42,300 Lexus vehicles equipped with Denso low-pressure fuel pumps and fuel pump assemblies that begin with part number prefixes 23220- and 23221- to the Recall.

13.     As alleged below, Plaintiff Gendron leased a Lexus vehicle which is, upon information and belief, equipped with a Denso low-pressure fuel pump and fuel pump assembly with Toyota part number 23220-31430.  Plaintiff Gendron's vehicle was listed in the First DIR as being included in the recall ("2018-2019" "Lexus/GX"), but was then omitted from the Second DIR, which includes only older (2014-2015) GX460 models.  Plaintiff Gendron's vehicle is equipped with the same Denso low-pressure fuel pump and fuel pump assembly with Toyota part number 23220-31430 installed in other vehicles included in the Recall: 2014-15 Toyota 4Runners, 2014 FJ Cruisers, and 2014-15 GX460s.  Thus, there are additional Toyota and Lexus vehicles vulnerable to the Fuel Pump Defect not subject to the Recall.

14.     Toyota's refusal to include all the Class Vehicles in the Recall in the Recall is utterly inconsistent with its acknowledgement that the Fuel Pump Defect presents an immediate risk of physical harm when the Class Vehicles are used in their intended manner and for their ordinary purpose.

---

produced from September 2, 2013 through February 21, 2015 and from October 3, 2017 through January 31, 2019.  *See* Exhibit D.

15.     The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, or even death.  A vehicle that stalls or suffers engine shutdown is at heightened risk for collision.  A vehicle that stalls or suffers engine shutdown causes drivers to react to remove themselves from danger, typically by exiting the road. Drivers stranded on the side of the road experience a heightened risk of danger, whether it is from other vehicles, remoteness or weather elements.

16.     Fuel pump failure can prevent the driver from accelerating at the necessary and anticipated pace.  Diminished acceleration ability creates unexpected hazards, startling drivers of the Class Vehicles and other drivers in their proximity.

17.     To date, Toyota has not provided a remedy for the Fuel Pump Defect. Whether there will be a corrective repair, and, if so, when, remains unknown. Thus, owners and lessees of the Class Vehicles are unknowingly driving on roads and highways in potentially ticking time bombs while Toyota knowingly exposes them, from whom it made billions from the sale of the Class Vehicles, to the risk of grave physical harm and even death.

18.     Compounding its wrongdoing, and despite admitting that the Fuel Pump Defect increases the likelihood of accidents, Toyota has not recommended or advised that consumers stop driving the Class Vehicles until the Fuel Pump Defect can be repaired.  Given the inherent dangers of driving the Class Vehicles, Toyota should have, at a minimum, contacted owners and lessees and offered them free loaner vehicles comparable to the type of Class Vehicle they drive until it could devise and implement a fix or take other action to protect consumers' safety. Toyota has not even done that.   Many owners and lessees of the Class Vehicles have not received any communication from Toyota about the Recall.

19.     Moreover, with or without a viable remedy for the Fuel Pump Defect, the Recall has decreased the intrinsic and resale value of the Class Vehicles.

Plaintiffs and other Class members have been damaged as a result. Owners and lessees of the Class Vehicles must continue to make full loan and lease payments on cars they cannot safely use, and Toyota refuses to provide them loaners comparable with the monthly payments.

20. Throughout the relevant period, Toyota's marketing of the Class Vehicles was and is replete with assurances about their safety and dependability. A vehicle that can suddenly stall and lose power during normal operating conditions is inherently unsafe and renders Toyota's marketing of the Class Vehicles untrue and materially misleading. Plaintiffs and other Class members have been damaged as a result.

21. Plaintiffs, on behalf of themselves and the Classes (as defined below), seek redress for Defendants' egregious and unconscionable misconduct, and assert claims on behalf of a California class for: (1) violation of California's Consumers Legal Remedies Act; (2) violation of California's Song-Beverly Consumer Warranty Act; (3) violation of California's False Advertising Law; (4) violation of California's Unfair Competition Law; (5) negligence; and (6) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* In addition, Plaintiffs seek an order enjoining Toyota's conduct, directing it to inform Class members of the Fuel Pump Defect and to cease driving their vehicles, directing Toyota to contact Class members and advise them that it will provide free loaner vehicles of comparable value until a remedy for the Fuel Pump Defect becomes available and is installed in their Class Vehicles; compensatory damages; restitution; and punitive damages.

## JURISDICTION AND VENUE

22. Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiffs and Class members are citizens of a state different than Defendants' home states, and the aggregate

1    amount in controversy exceeds $5,000,000, exclusive of interest and costs.

2        23.    Subject matter jurisdiction is also proper in this Court pursuant to 28

3    U.S.C. § 1331 because Plaintiffs' Magnuson-Moss Warranty Act claim arises

4    under federal law, and this Court has supplemental subject matter jurisdiction over

5    Plaintiffs' state law claims under 28 U.S.C. § 1367.

6        24.    This Court has personal jurisdiction over Toyota because Toyota

7    conducts substantial business in this District and some of the actions giving rise to

8    this action took place in this District and/or caused injury to property in this state;

9    and products, materials, or things processed, serviced, or manufactured by Toyota

10   anywhere were used or consumed in this state in the ordinary course of commerce,

11   trade, or use. Toyota is a principal shareholder of Denso and owns in excess of 24$

12   of its equity.  Toyota is one of the largest manufacturers and sellers of automotive

13   vehicles in the world. Toyota has, at all relevant times, conducted and continues to

14   conduct business in California and in every other state in the country.

15       25.    This Court has personal jurisdiction over Denso because Denso

16   routinely conducts business in this District and some of the actions giving rise to

17   this action took place in this District and/or caused injury to property in this state;

18   and products, materials, or things processed, serviced, or manufactured by Denso

19   anywhere were used or consumed in this state in the ordinary course of commerce,

20   trade, or use.  Toyota is a principal shareholder of Denso and owns in excess of

21   24% of its equity.  Toyota vehicles all over the world, including this District, are

22   equipped with Denso parts, including the Denso low-pressure fuel pump.  Denso

23   has, at all relevant times, conducted and continues to conduct business in

24   California and in every other state in the country.

25       26.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because

26   a substantial part of the events or omissions giving rise to these claims occurred in

27   this District and Defendants have caused harm to Plaintiffs Gendron and Carter

28

and other Class members in this District.  Moreover, Toyota is a resident of this District under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction in this District. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

## THE PARTIES

## I.    PLAINTIFFS

27.    Plaintiff Elizabeth Gendron ("Gendron") is a citizen of the State of California and resides in Orange County.

28.    Plaintiff Gendron leased a new 2018 Lexus GX460 from Newport Lexus in Newport Beach, California in December of 2017.  Upon information and belief, Plaintiff Gendron's Lexus is within the affected population of Toyota and Lexus vehicles because it is equipped with a Denso low-pressure fuel pump and fuel pump assembly with Toyota part number 23220-31430.  Other Class Vehicles (*i.e.*, 2014-15 Toyota 4Runners, 2014 FJ Cruisers, and 2014-15 GX460s) that are equipped with Denso low-pressure fuel pumps and fuel pump assemblies bearing Toyota part number 23220-31430 are identified in the Recall.  Plaintiff Gendron's Class Vehicle, however, is not. Plaintiff Gendron's belief that her Class Vehicle is within the affected population of Toyota and Lexus vehicles is informed by the fact that Plaintiff Gendron's dealer provided her with the part number for the Denso low-pressure fuel pump and fuel pump assembly installed in her Class Vehicle. Plaintiff Gendron's Class Vehicle was listed in the First DIR as being included in the Recall ("2018-2019" "Lexus/GX"), but was then omitted from the Second DIR, which includes only older (2014-2015) GX460 models.

29.    Prior to leasing her Lexus, Plaintiff Gendron reviewed Toyota's promotional materials, such as Toyota's "Lexus December to Remember" advertisements and sales brochures, and interacted with at least one sales representative without Toyota disclosing the Fuel Pump Defect.

30.     Due to her exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff Gendron was aware of Toyota's marketing message of dependability and safety, which is a primary reason she leased her Class Vehicle.  When she leased her Class Vehicle, Plaintiff Gendron reasonably believed, based on Toyota's marketing, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Gendron leased her vehicle did Toyota disclose to her the existence of the Fuel Pump Defect.

31.     Plaintiff Gendron began to experience the Fuel Pump Defect shortly after taking possession of her vehicle. In many instances, Plaintiff Gendron's vehicle hesitates before accelerating when she depresses the accelerator pedal.

32.     Plaintiff Gendron leased her Class Vehicle with the Fuel Pump Defect as part of a transaction in which Toyota did not disclose material facts related to the vehicle's essential purpose – safe transportation. Plaintiff Gendron did not receive the benefit of her bargain. She leased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the value of Plaintiff Gendron's Class Vehicle.

33.     Had Toyota disclosed the Fuel Pump Defect, or that her Class Vehicle was equipped with the same Denso low-pressure fuel pump and fuel pump assembly bearing part number 23220-31430 installed in other Toyota and Lexus vehicles that have the Fuel Pump Defect, Plaintiff Gendron would not have leased her Class Vehicle, or certainly would have paid less to do so.

34.     Plaintiff Roger Carter ("Carter") is a citizen of the state of California and resides in Orange County.

35.    Plaintiff Carter leased a new 2018 Lexus IS 300 F Sport from South County Lexus in Mission Viejo, California, in August of 2018.  Plaintiff Carter's Lexus has a defective Denso low-pressure fuel pump and is included in the Recall.

36.    Prior to leasing his Lexus, Plaintiff Carter reviewed Toyota's promotional materials, such as Toyota's "Lexus December to Remember" advertisements and sales brochures, and interacted with at least one sales representative without Toyota disclosing the Fuel Pump Defect.

37.    Due to his exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff Carter was aware of Toyota's marketing message of dependability and safety, which is a primary reason he leased his Class Vehicle. When he leased his Class Vehicle, Plaintiff Carter reasonably believed, based on Toyota's marketing, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Carter leased his vehicle did Toyota disclose to him the existence of the Fuel Pump Defect.

38.    Toyota never contacted Plaintiff Carter about the Recall.   He happened to learn of the Recall when he visited Lexus' website a few weeks prior to the filing of this complaint.

39.    The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff Carter and others on the road.

40.    Plaintiff Carter leased his Class Vehicle with the Fuel Pump Defect as part of a transaction in which Toyota did not disclose material facts related to the vehicle's essential purpose – safe transportation.  Plaintiff Carter did not receive the benefit of his bargain.  He leased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and

reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the value of Plaintiff Carter's Class Vehicle.

41.    Had Toyota disclosed the Fuel Pump Defect, Plaintiff Carter would not have leased his Class Vehicle, or certainly would have paid less to do so.

## II.    DEFENDANTS

### A.    Toyota

42.    Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-8571, Japan. TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc.

43.    TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota automobiles in the United States, including California.

44.    Defendant Toyota Motor North America, Inc. ("TMNA") is incorporated in California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024. TMNA is a holding company of sales, manufacturing, engineering, and research and development subsidiaries of TMC located in the United States.

45.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated in California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024. Prior to 2017, TMS's headquarters were located in Torrance, California

46.    TMS is the United States sales and marketing division for TMC, which oversees sales and other operations across the United States. "Every [Toyota] sold in the U.S. depends upon [TMS's] extensive network of dedicated professionals who align sales and marketing resources for [Toyota's] dealers nationwide."[14] TMS was responsible for Toyota's marketing of the Class Vehicles

---

[14]    *See* https://www.toyota.com/usa/operations#!/Sales-Marketing (last visited January 29, 2020).

as safe and dependable.

47.    TMS distributes the Class Vehicles and sells them through a network of dealerships that are the agents of TMS.  Money received from the purchase of a Toyota made vehicle from a dealership flows from the dealer to the TMS.  TMS issues the express repair warranties for the Class Vehicles.

48.    Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is incorporated in Kentucky and has its primary address at 6565 Headquarters Dr., Plano, Texas 75024.

49.    TEMA is "responsible for [Toyota's] engineering design and development, R&D and manufacturing activities in the U.S., Mexico and Canada."[15]

50.    Lexus is a wholly owned brand, subsidiary, and/or division of TMC and/or TMS.  TMC and TMS employ engineering, legal, compliance, and regulatory personnel to make decisions regarding the subject Lexus vehicles. These employees, on behalf of TMC and TMS, ultimately made or ratified the decisions that allowed the subject Lexus vehicles to be fraudulently designed, manufactured, marketed, and sold.

**B.    Denso**

51.    Defendant Denso Corporation ("DC") is a Japanese corporation located at 1-1, Showa-cho, Kariya, Aichi 448-8661, Japan. DC is the parent company of Denso International America, Inc.  The largest shareholder of DC is TMC.[16]

52.    DC, through its various entities, designed, engineered, tested, and

---

[15]    *See* https://www.toyota.com/usa/operations/index.html (last visited February 3, 2020).

[16]    *See* https://www.denso.com/global/en/investors/stock/overview/ (last visited April 15, 2020).

validated the Denso low-pressure fuel pump that is equipped in Toyota vehicles sold/leased in the United States, including in California.

53.   Denso International America, Inc. ("DIA") is incorporated in Delaware and has its principal place of business at 24777 Denso Drive Southfield, Michigan 48033.

54.   DIA is "Denso's North American regional headquarters and parent company for its North American operations, including design and production engineering, technical support, sales and finance."[17]

55.   DIA, through its various entities and on behalf of DC, designed, engineered, tested, and validated the Denso low-pressure fuel pump that is equipped in the Class Vehicles across the Unites States, including in California.

## FACTUAL ALLEGATIONS

56.   Toyota is the world's second largest manufacturer of automotive vehicles and sells its vehicles across the United States through a network of over 1,200 dealers, including those in California.

57.   In addition to Toyota vehicles, Toyota designs, manufacturers, markets and sells its Lexus branded vehicles across the United States, including in California.

58.   Toyota has branded itself as the maker of safe and dependable vehicles and has spent millions, if not billions, of dollars on extensive marketing and advertising campaigns to cement the association of safety and reliability with its Toyota and Lexus brand automobiles, including the Class Vehicles.

59.   Toyota designs, manufactures, markets, and sells the Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

---

[17]   https://www.denso.com/us-ca/en/about-us/company-information/diam/   (last visited April 9, 2020).

60.     Denso is the No. 2 Tier1 automotive components manufacturer in the world. As a global company, Denso supplies products and technologies to numerous automobile manufacturers all around the world, including Toyota.[18]

61.     When designing, engineering, testing, and manufacturing its products, Denso professes to "[c]ontribute to future mobility that is safer, more comfortable and convenient for everyone."[19]  The Denso low-pressure fuel pump fails to meet Denso's published standard.

62.     The Defendants collectively designed, engineered, tested, validated, manufactured and placed in the stream of commerce the defective Denso low-pressure fuel pump in a manner that subjects Class members to an unreasonable risk of death or injury.

63.     Despite producing the Class Vehicles with defective Denso low-pressure fuel pumps, Toyota marketed and sold the Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

## I.    THE DENSO LOW-PRESSURE FUEL PUMP

64.     The Class Vehicles are equipped with a Denso low-pressure fuel pump with a part number prefix 23220- or 23221- (the "Fuel Pump").

65.     All the Class Vehicles are equipped with the same or substantially similar defective Fuel Pump.

66.     The Fuel Pump assembly is mounted inside of the fuel tank.  The Fuel Pump assembly consists of a fuel intake strainer at one end and a fuel output line at the other.  At the heart of the Fuel Pump assembly is an electric motor with a plastic impeller attached to a rotating shaft.  Protruding from the side of the Fuel

---

[18]     *Id.*

[19]     https://brand.denso.com/en/ourpromise (last visited April 9, 2020).

Pump assembly is a fuel level float and a fuel level sender.  Figure 1 illustrates the parts of the Fuel Pump assembly.



*Figure 1:  Fuel Pump Assembly Diagram*[20]

67.    As the electric motor rotates the impeller spins generating negative pressure.  The negative pressure pulls fuel into the pump housing where it passes through the electric motor assembly and exits through the output, into the fuel line and forward to the fuel filter.  After exiting the fuel filter, the fuel flow is

[20]    http://www.agcoauto.com/content/news/p2_articleid/195    (last    visited January 30, 2020).

accelerated via a pump which delivers pressurized fuel to injectors mounted in the engine.  Figure 2 illustrates this sequence.



*Figure 2:  Fuel Pump Sequence*[21]

68.    At all times, by design, the Fuel Pump assembly and all of its components are exposed to gasoline within the tank.  Fuel pumps are designed to last for at least 50,000 miles, however, can survive for much longer.[22]

## II.    THE CLASS VEHICLES SUFFER FROM A FUNDAMENTALLY DEFECTIVE FUEL PUMP

69.    As described herein, the Fuel Pumps suffer from a fundamental defect causing them to prematurely fail.  Based on Toyota's own admissions, the failure involves a defectively designed plastic impeller.

70.    The Fuel Pump assembly in the Class Vehicles was under-designed.

71.    First, the Fuel Pump "contain[s] an impeller that could deform due to

---

[21]    *See*    https://www.autoplusdubai.net/blog/fuel-pumps-common-causes-and-how-to-identify-it/ (last visited January 30, 2020).

[22]    *See*  https://www.autoblog.com/2016/01/14/how-long-does-a-fuel-pump-last/ (last visited April 15, 2020).

excessive fuel absorption."[23]   The impeller in the Fuel Pump is made of material that is unsuitable for its environment due to its propensity to absorb fuel which causes the impeller to swell and premature and unexpected Fuel Pump failure.

72.    Second, the impeller has inferior long-term dimensional stability; it deforms, swells and changes shape, and causes premature and unexpected failure when it "creates sufficient interference with the [F]uel [P]ump body to cause the [F]uel [P]ump to become inoperative."[24]

73.    Third, the impeller's material has inadequate heat resistance, which also can result in dimension distortion and loss of structural integrity when exposed to high temperatures or repeated temperature cycling.

74.    Plastics absorb liquids, typically.  However, the degree of absorption varies depending on the type of plastic and its environmental conditions.  When plastics absorb liquid, such as gasoline, the plastic's intended dimensions change. Knowing this, Defendants were obligated to adequately design and validate plastic materials exposed to fuel ensure that they remain dimensionally stable.[25] Defendants failed to do that with respect to the Class Vehicles.

75.    At the time Defendants designed, engineered, tested, validated, manufactured, and placed the Class Vehicles with the Fuel Pump in the stream of commerce, they were aware of, and had access to, reasonable alternative designs. Such designs would mitigate or eliminate the Fuel Pump Defect.

76.    Presumably, this alternative design would render Fuel Pump impellers: (a) impermeable to fuel and fuel solvents under intended and foreseeable circumstances; (b) non-susceptible to deformation under intended and foreseeable

---

[23]    Exhibit A.

[24]    Exhibit C.

[25]    *See, generally,* https://www.ensingerplastics.com/en-us/shapes/plastic-material-selection/dimensionally-stable (last visited February 2, 2020).

circumstances; and (c) non-susceptible to premature aging under intended and foreseeable circumstances.

77.    Toyota acknowledged in connection with the Recall that the impeller in the Fuel Pump was poorly designed and cannot remain dimensionally stable under intended and foreseeable conditions.   Toyota admitted in the DIRs that impeller deformation "may interfere with the [F]uel [P]ump body" causing it to fail and become inoperable.[26] Thus, the Fuel Pump and impeller are not designed with the requisite robustness to operate safely under normal operating conditions. Defendants were aware of their design failure affecting the Fuel Pump as of the submission of the First DIR, if not earlier, insofar as Toyota had already received 66 Field Technical Report and 2,571 warranty claims associated with the Fuel Pump Defect.

78.    Indeed, in April 2019, *8 months before* the First DIR which recalled almost 700,000 Class Vehicles, Defendants purportedly redesigned the production process for the impellers in the Fuel Pumps to mitigate, resolve, and/or eliminate the Fuel Pump Defect.[27]

79.    Despite changes to design and the production process to "improve" the impellers, no remedy has been made available by Toyota to mitigate, resolve, and/or eliminate the Fuel Pump Defect.

## III.    THE DESIGN FLAW REDUCES ENGINE POWER, CAUSES VEHICLE STALLING, AND CAN LEAVE THE CLASS VEHICLES COMPLETELY INOPERABLE COMPROMISING CONSUMER SAFETY

80.    The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, even death.  In fact, Toyota has tacitly admitted as much

---

[26]    *See* Exhibit A.

[27]    *See* Exhibit B.

- 21 -

in the DIRs and elsewhere, stating the Fuel Pump Defect can "increas[e] the risk of a crash."[28]

81.    The Fuel Pump is an integral component of safe vehicle operation. But as described herein, the Class Vehicles suffer from a fundamental design flaw that causes the Fuel Pump to prematurely fail.  As Toyota admitted in the First and Second DIRs, the deformed impeller comes in contact with the Fuel Pump body, creating excess running resistance, causing "illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall . . . ."

82.    Engines necessarily require steady gasoline supply in order to function properly.  When the Fuel Pump fails, gasoline is not supplied to the engine, causing reduced engine power, stalling, and/or engine shutdown.

83.    Compounding the problem, the Fuel Pump Defect occurs spontaneously with no advance warning to the consumer, thereby creating an extremely dangerous condition for drivers and occupants of the Class Vehicles.

84.    Class members' complaints set forth below exemplify the real-world dangers caused by the Fuel Pump Defect.

85.    Vehicle manufacturers like Toyota monitor NHTSA and other databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects. Accordingly, Toyota knew, or should have known, of the many complaints lodged with NHTSA and elsewhere about the specific safety hazard that is the subject of the Recall.

86.    By way of example, the consumer complaints set forth below demonstrate the seriousness of the Fuel Pump Defect and, further, show that Toyota knew or should have known of them.

---

[28]    *Id.*

- 22 -

87.    On March 11, 2019, the owner of a 2018 Toyota Camry filed the following complaint with NHTSA:[29]

> Lag and hesitation when going to full throttle on the gas pedal. It hesitates for a second and then finally grabs on to accelerate. ***It has done this since I purchased it but was hoping it would work itself out eventually, but this hasn't happened.*** Toyota did a TSB software update for the 4 cylinder but not the v6.[30]

88.    On August 9, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> 2019 Highlander XLE loses power, unable to accelerate, & jerks and stalls in traffic.   Bought at 200 miles, certified preowned. It is a nightmare vehicle.
>
> Accelerator has been touchy and jumpy at times, intermittently at slow speeds. First time it stalled it started to lose power put -put and chug like jerking and all dash and electrical on dash went out, unable to accelerate, then stalled out in road, unable to steer or control vehicle. This occurrence was after a longer period of driving. Second time it stalled out began to lose power, putter and chug, unable to accelerate applying gas pedal, getting no gas, vehicle dies out, unable to steer or control vehicle. This occurrence was after a longer period of driving. Third time was yesterday 8-8-19. Left work and about 5-7 minutes into my drive, started hesitating, losing all dash and electrical

---

[29]    Consumer complaints posted on NHTSA are reported in all capitalized text. That text has been reformatted into sentence case here for ease of readability. However, all typographical errors in quoted complaints are reproduced from the originals.

[30]    NHTSA Complaint ID No. 11185947 (emphasis added).

power and will not accelerate when gas pedal applied, then stalls out, unable to control the steering wheel again! ***Almost got hit this time, man behind me coming fast and had to swerve into lane over to miss me. This car is going to kill me or someone by causing an accident if they do not get it fixed right.*** After the second stall it was towed into dealership and they were not sure but said fuel pressure was reading 22 and was supposed to be in the mid to high 50's. They replaced the fuel pump and it drove ok for a little while but I noticed the average fuel mileage going down from an approx in city 19.1--20 to 17.1-17.3. Has never been so low so obviously the stalling and the replacing or the fuel pump are not the real issue. Fuel economy going down since replacement of the fuel pump and now another dangerous stalling issue. Car is at Toyota dealer now. They need to dive much deeper & resolve this very dangerous safety issue! ***I bought this car to feel safe and have reliable transportation and have neither. It really scares me.***[31]

89.     On February 9, 2019, the owner of a 2018 Toyota Camry filed the following complaint with NHTSA:

I have had constant problems with my 2018 Camry since purchasing May 2018. My car is always jerking as I accelerate and when I'm driving in town, feels like I'm getting rear-ended and hesitating on highway when I have to accelerate into traiffic which is very dangerous when the car won't get up and go. I have had it to the dealer several times. They reset the computer because it can save settings from previous drivers. That didn't help. They told me that it's a

---

[31]     NHTSA Complaint ID No. 11242822 (emphasis added).

- 24 -

different transmission and it takes few seconds for the computer to communicate back to transmission. This is a very unsafe feature ....[32]

90.    On September 11, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> *Severe hesitation when gas is applied, especially when crossing heavy traffic and instant power/quick acceleration needed.* Also noted when going around corners, after car has slowed down below 5 mph to make the corner. Gas is applied with hesitation. Noted more when car is at a complete stand still/moving at slow speed then gas applied to move forward. *Car does not move/react instantly.* I notice this problem on a weekly (at least) basis.[33]

91.    On September 11, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> *2019 Highlander XLE jerks and stalls, then loses power.* This occured on a newly purchased vehicle that has approximately 13k miles on it, in stop and go traffic on a sub-urban street. *No check engine light or other alert came on, providing no indication to the driver of the issue.* Was able to restart the vehicle and drive it to the dealership. *They said it was a fuel pressure issue, and are replacing the fuel pump - a part that usually lasts more than 200,000 miles.* I have no idea whether this is a fuel pump issue, or a fuel regulation issue, and if those functions are both performed by the fuel pump. The dealer did not seem to be aware of the issue, and there are no related recalls for this issue. They did find one other instance of this

---

[32]    NHTSA Complaint ID No. 11175845.

[33]    NHTSA Complaint ID No. 11254633 (emphasis added).

occurring when they researched it. I'd like to know for certain whether this is a fuel pump issue, or a fuel regulation issue. ***This presented a very dangerous situation, and I was lucky to be able to get off the road***.[34]

92.    On October 31, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> The contact leases a 2019 Toyota Highlander. ***While driving, the engine stalled without warning and the steering wheel seized. The contact coasted the vehicle over to the side of the road*** and powered off the engine. The vehicle was restarted and was able to drive normally; however, the failure recurred twice. The vehicle was taken to page Toyota (21262 Telegraph Rd, Southfield, MI 48033, (248) 352-8580) where it was diagnosed, but the technician could not find a failure code. The vehicle was not repaired. The manufacturer was made aware of the failure and provided case number: 1910282286. The failure mileage was approximately 4,000.[35]

93.    On October 20, 2019, the owner of a 2019 Highlander filed the following complaint with NHTSA:

> Stopped at a stop light and when it turned green pushed on the gas pedal. ***The entire car jerked and didn't have any power to go through the intersection***. The RPM gage began jumping as the car rolled. ***I rolled on through the intersection, was almost hit.*** Had no steering ability. Lights and alarms began going off. Message board said traction control turned off. Then check engine. Then visit dealer.

---

[34]    NHTSA Complaint ID No. 11254630 (emphasis added).

[35]    NHTSA Complaint ID No. 11277376 (emphasis added).

- 26 -

***Then the car died at the edge of the intersection and we pushed it off the highway*** onto a county road. It will not start at all. Acts like it isn't getting any gas. This is the 3 incident with this car doing this. We have towed it twice to the dealership. They replaced a valve in the engine. They said it was stuck. Apparently that wasn't what is wrong with it. ***Glad this wasn't on the interstate. We could have been killed***.[36]

94.    On November 24, 2019, the owner of a 2018 Camry filed the following complaint with NHTSA:

When driving the vehicle, the transmission does not appear to know what gear to be in and is always searching. So much so that ***it will lunge at times when all you are trying to do is accelerate.*** When slowing down and then slowly applying gas again, nothing happens for a good 10 seconds and then ***it surges and causes my head to slam into the back of the head rest***. Also while idling the vehicle is decently loud, more so when defroster is engaged. At freeway speeds it tends to do better, but most issues appear to be in city day to day driving from the transmission/ or fuel system.[37]

95.    On March 5, 2020, the owner of a 2014 Toyota FJ Cruiser filed the following complaint with NHTSA:

The contact owns a 2014 Toyota FJ Cruiser. The contact stated that while coming to a stop and pulling into a drive thru, ***the vehicle stalled*** while the check engine warning light illuminated

---

[36]    NHTSA Complaint ID No. 11269776 (emphasis added).

[37]    NHTSA Complaint ID No. 11282087 (emphasis added).

intermittently. The contact was able to restart the vehicle. ***The failure recurred multiple times***.[38]

96.    On March 28, 2017, the owner of a 2014 Lexus GS350 filed the following complaint with NHTSA:

While driving at approximately 40 mph, ***I experienced an engine stall***. This caused difficulty in steering and braking ***resulting in an accident***.[39]

97.    On March 5, 2020, the owner of a 2018 Toyota Sienna filed the following complaint with the NHTSA:

The contact owns a 2018 Toyota Sienna. The contact stated that after coming to a complete stop, the vehicle hesitated without warning as the accelerator pedal was depressed. Upon investigation, the contact discovered NHTSA campaign number: 20v012000 (fuel system, gasoline) however, the parts to do the repair were unavailable. The contact stated that the manufacturer exceeded a reasonable amount of time for the recall repair.[40]

98.    On November 8, 2019, the owner of a 2019 Toyota Sienna filed the following complaint with NHTSA:

I pulled onto a highway and reaching about 25 mph the 2019 sienna hesitated for at least 10 seconds as if it was not getting gas. I pressed the gas wanting to get out of the way of traffic and it jumped slightly but would not go. Then it kicked in with a few hesitations and took off. Another 100' or so, it did it again. Prior to this i had already

---

[38]    NHTSA Complaint ID No. 11316305 (emphasis added).

[39]    NHTSA Complaint ID No. 10968914 (emphasis added).

[40]    NHTSA Complaint ID No. 11316449.

brought it to toyota complaining that there is a hesitation when the van is not warmed up yet between 20-40 mph. It is only slight, but noticeable and feels like it is not getting gas. The van does this every time after it has been sitting long enough to cool down. The long hesitation only happened twice so far (dangerous enough!), there have been a few shorter ones, and then there is the every time slight hesitation. Toyota has told me nothing shows in their diagnostics and they do not know what is wrong. They tried cutting the power to the computer to reset the memory, but this did not change anything.[41]

99.    On March 7, 2020, the owner of a 2019 Toyota Avalon filed the following complaint with NHTSA:

My car mostly parked in the garage. Lately, it's getting worse and noticing engine running rough, stall at speed about 20 mph and humming from under rear of the car hours after it's shut off.[42]

100.    On January 17, 2020, the owner of a 2018 Toyota Tacoma filed the following complaint with NHTSA:

When slowing down before making a left turn across traffic, ***after the vehicle comes to a crawl or stop and then I accelerate to turn left across traffic, the engine hesitates for 1 to 2 seconds before accelerating***. I took my 2018 Toyota Tacoma to my dealer and they were able to replicate the problem. A re-set or upgrade to the computer has not fixed the problem.[43]

101.    On March 17, 2020, the owner of a 2019 Lexus RX350 filed the

---

[41]    NHTSA Complaint ID No. 11278845.

[42]    NHTSA Complaint ID No. 11316755.

[43]    NHTSA Complaint ID No. 11300086 (emphasis added).

following complaint with NHTSA:

> ***While driving on a city street the warning lights came on and the car stalled***. I was alone in the car and in downtown city traffic with honking cars behind me. I was able to restart the car after a few attempts. ***A few days after this incident, while driving on a very busy hwy at 55mph the car engine was skipping as if about to stall***. I had a passenger in my car who experienced this rough ride and made a comment about it. ***A few days later, on march 8,2020, I received an email from Lexus Enform services with a vehicle health report informing me that my vehicle requires attention due to a safety recall 20la01***. When I leased my vehicle, I was never informed of this recall which goes back to 01/13/2020. ***Safety is a top concern for me and I fully communicated this to the salesperson when i leased my car but i was not informed of this recall at that time.*** I have exactly 2800 miles on my car. ***I am not able to use it because the service department at lexus does not have a remedy available to fix the low - pressure fuel pump and they do not know when they will have it.*** I want to drive a vehicle that is safe not one that increases the risk of having a crash.[44]

102.   On November 8, 2018, the owner of a 2018 Lexus RX350 filed the following complaint with NHTSA:

> ***Hesitation upon acceleration***. The engine does not respond in a linear manner when pressing the gas pedal.[45]

---

[44]     NHSTA Complaint ID No. 11318534 (emphasis added).

[45]     NHSTA Complaint ID No. 11150133 (emphasis added).

103.   On January 3, 2017, the owner of a 2015 Lexus LS460 filed the following complaint with NHTSA:

> **Fuel system shuts down while driving at highway speeds** band new car with 7,623 miles. **Had to have the entire low end fuel pump system replaced. Issue still ongoing. Car will not start now**.[46]

104.   On January 15, 2020, the owner of a 2019 Toyota Sienna filed the following complaint with the NHTSA:

> **Pulled out into oncoming traffic and vehicle hesitated and would not accelerate**. Dash lights came on and car stalled. Attempted to crank van and it restarted but would **barely move with the accelerator pressed fully**. **Had to call a tow truck to have it delivered to the dealer**.  I called Toyota road side assistance number and 2.5 later no one showed up. Called again and demanded a different tow company respond and 30 minutes later someone was at the scene. This episode stated 230 pm and van was picked up 637pm.[47]

105.   Consumers also filed additional complaints about the Fuel Pump Defect on other websites that Toyota monitored, or should have been monitoring.

106.   For example, on carcomplaints.com, a popular site that collects complaints lodged by drivers,[48] an owner of a 2018 Toyota Camry stated:

> The response time of accelerating and the car moving is significant at irregular intervals. **This is hazardous when I am planning to overtake** because it takes longer than expected.[49]

---

[46]    NHSTA Complaint ID No. 10939537 (emphasis added).

[47]    NHTSA Complaint ID No. 11299633 (emphasis added).

[48]    The excerpts are true and correct copies of the original complaints published on carcomplants.com.

107.   On carcomplaints.com, an owner of a 2018 Toyota Camry stated: When driving my vehicle I get a stalled response when pressing on the gas and ***then it jerks forward. This can be very dangerous when driving on the streets*** because there is a lot if stop and go movements. It usually happens when I come to a complete stop at a stop light or stop sign, even when stopping to turn down a street. I'm not sure why the vehicle does this, I just bought it so it should still be in very good shape. ***I'm reporting this because it can be a potential hazard for a car crash.*** Please have Toyota fix this problem in their 2018 Toyota Camry se.[50]

108.   As demonstrated above, the Class Vehicles suffer from a uniform design defect that causes the Fuel Pump to malfunction and fail prematurely. Compounding the issue, drivers often are not protected from these safety risks by a warning prior to Fuel Pump failure.

109.   The Fuel Pump Defect causes vehicles to become dangerous to operate or inoperable while on the road and therefore they are not fit for their ordinary purpose.

## IV.   DEFENDANTS KNEW ABOUT THE FUEL PUMP DEFECT, BUT CONTINUED TO MANUFACTURE, MARKET, AND SELL CLASS VEHICLES

110.   Defendants knew or should have known about the Fuel Pump Defect, but concealed or failed to disclose the defect and continued to manufacture,

---

[49]

http://m.carcomplaints.com/Toyota/Camry/2018/fuel_system/fuel_propulsion_system.shtml (last visited February 3, 2020) (emphasis added).

[50]   http://m.carcomplaints.com/Toyota/Camry/2018/engine/engine.shtml    (last visited February 3, 2020) (emphasis added).

market, and sell the Class Vehicles.  Specifically, Defendants knew or should have known that the Fuel Pump Defect exposed Class members to extreme danger when they operated the Class Vehicles and, in order to render such vehicles safe, Defendants needed to replace the Fuel Pumps in the Class Vehicles so that functioned safely as intended.  Defendants, however, failed to take corrective action.

111.   Toyota knew or should have known about the Fuel Pump Defect since the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles.  During these phases, Toyota would have gained comprehensive and exclusive knowledge about the Fuel Pumps, particularly the basic engineering principles behind the construction and function of the Fuel Pumps such as the susceptibility of the impellers to fuel absorption and deformation.   However, Toyota failed to act on that knowledge and instead installed the defective Fuel Pumps in the Class Vehicles, and subsequently marketed and sold the vehicles to unsuspecting consumers without disclosing the safety risk or warning Class members.

112.   Moreover, Toyota knew about the Fuel Pump Defect based on the large number of claims for Fuel Pump Defect repair and replacement that it admits to receiving.   Indeed, as of January 7, 2020, Toyota identified at least 2,571 warranty claims associated with the Fuel Pump Defect.[51]

113.   Defendants' knowledge predates the mid-June 2019 date that Toyota claims it first began to investigate the Fuel Pump Defect after "observ[ing] an increase in field reports related to the [Denso] low pressure fuel pumps …."[52] According to Toyota, Defendants changed the production process for the Fuel

---

[51]    *See* Exhibit C.

[52]    *Id.*

- 33 -

Pump in April 2019 specifically to improve the impeller.  And, it appears that those new fuel pumps were to be the replacements for the defective ones.[53]

114.    Federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential defects.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).  Accordingly, Toyota should (and does) monitor NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Fuel Pump Defect.

115.    From its monitoring of the NHTSA databases, Toyota knew or should have known of the many Fuel Pump Defect complaints lodged, such as those quoted in Section III above.  However, Toyota failed to act on that knowledge by warning Class members.

116.    Finally, Toyota knew about the Fuel Pump Defect through its own investigation. Toyota admitted to conducting 73 field investigations as part of which it generated Field Technical Reports.[54]  However, Toyota failed to act on that knowledge by warning Class members.

117.    Despite Toyota's extensive knowledge, Toyota failed to act on that knowledge by warning Class members.  Sacrificing consumer safety for profits,

---

[53]    *See* Exhibit B ("Q3. What does the remedy involve? A3. For all involved vehicles, Toyota dealers will replace the low-pressure fuel pump with an improved one free of charge to customers.  … Q5. What was the improvement made to the fuel pump? A5. In April 2019, the production process was changed so that the fuel pump impellers were improved.").

[54]    On April 9, 2020, Toyota submitted an amended defect information report to NHTSA (the "Fourth DIR"), a copy of which is attached hereto as Exhibit E.  The Fourth DIR states that as of March 4, 2020 "there are 73 Field Technical Reports and 3,358 warranty claims that have been received [by Toyota] from U.S. sources that relate or may relate to the fuel pump failure investigated in this chronology …."

Toyota instead chose to enrich itself by using false and misleading marketing to sell the Class Vehicles as safe and durable at inflated prices.

118.   Moreover, Denso knew as early as 2016 about the Fuel Pump Defect. In 2016, Denso filed a patent application with the United States Patent and Trademark Office to change the chemical composition of its impeller for greater resistance to swelling. As Denso stated in the application:

> The housing includes an inner wall defining a pump chamber into which a fuel flows. The impeller is made of resin and housed in the housing. The impeller is positioned such that a clearance having a specified dimension is secured between the inner wall and the impeller. ***The impeller may be swelled due to the fuel and water contained in the fuel, therefore a rotation of the impeller may be stopped when the impeller is swelled and comes in contact with the housing.*** Thus, the dimension of the clearance is set to prevent the impeller from coming in contact with the housing. However, when the dimension of the clearance is too large, an abnormality, e.g., an increase of an output loss of the fuel pump or an increase of a power consumption of the fuel pump, may occur because the fuel leaks through the clearance. ***Therefore, it is required to find a resin material to suppress a dimensional change of the impeller, which is mounted to the fuel pump, due to the fuel and the water contained in the fuel. The dimensional change will be referred to as a swelling amount hereinafter***.[55]

---

[55]   https://patentscope.wipo.int/search/en/detail.jsf?docId=US231859533   (last visited April 19, 2020) (emphasis added).

## V.    TOYOTA CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE AND DEPENDABLE, CONCEALING THE FUEL PUMP DEFECT

119.    Toyota's overarching marketing message for the Class Vehicles was that the vehicles are safe and dependable and that their engines can be relied on to perform well.    This marketing message is false and misleading given the propensity of the Fuel Pumps in the Class Vehicles to fail, causing the vehicles' engines to run rough, stall and become inoperable, which Toyota admits increases the risk of a crash.

120.    In late 2010, after suffering public embarrassment over widespread unintended acceleration claims, Toyota's top executives "decided to revamp its marketing message and shift the focus to safety in a big way."[56]  As detailed in an article in Ad Age titled, "Toyota to Push Safety in Upcoming Ad Blitz:"

> Toyota Motor Sales U.S.A.'s overall sales fell 34% in August and are down 1% for the year – it's the only major manufacturer with a decline for 2010. Executives admit that consumers have doubts about the safety and quality of Toyota vehicles, so the automaker is planning an advertising blitz to counter that perception.
>
>  For years, Toyota's brand message has been based on quality, durability and reliability, with a dash of value thrown in at the tagline. But with both Toyota loyalists and possible converts now skeptical of that message, the automaker is putting safety first.
>
> "What were dealing with is a perception issue, and brand perceptions are not brand realities," said Bob Carter, Toyota Division general

---

[56]    Mark Rechtin, "Toyota to Push Safety in Upcoming Ad Blitz," September 6, 2010, Ad Age, *available at* http://adage.com/article/news/advertising-toyota-push-safety-upcoming-ad-blitz/145729/ (last visited April 16, 2020), referencing statement made by top Toyota executives to Automotive News.

manager. "If a customer has removed us from their consideration list, it was because of a perception of Toyota safety."

\* \* \*

Mr. Carter said the safety theme will continue in Toyota's brand advertising until consumer attitudes change.

\* \* \*

"This is not a short-term thing where we run an execution or two," Mr. Fay said. "We still have QDR. We just have to assure customers that's the case."[57]

121.   In furtherance of its safety centric campaign, Toyota produced a video commercial with a voiceover that stated: "Everyone deserves to be safe. That's why every Toyota now comes with the Star Safety System, standard. … We always think of safety, even in the concept design of our vehicles … we know there's nothing more important to you than your safety."[58]

122.   Additionally, in January 2011, Toyota added a page to its website called "Toyota Safety" which highlighted Toyota's array of safety features. A video imbedded in this page featured the following text, "Everyone deserves to be safe. Which is why Toyota is doing even more to enhance our cars' safety and technology."[59] Toyota also boasted, "[a]t Toyota, we're currently investing one million dollars an hour to enhance the safety and technology of our vehicles."[60]

---

[57]   *Id.*

[58]   https://www.youtube.com/watch?v=a_vaFypz8xk    (last   visited   April   9, 2020).

[59]   https://web.archive.org/web/20110103143210/http://www.toyota.com:80/safety/ (last visited April 9, 2020).

[60]   *Id.*

123.    Toyota's message of safety first continues through present day.

124.    Toyota is one of the ten biggest advertising spenders in the United States,[61] and much of that advertising budget goes toward promoting its brands as safe and dependable.   Through its marketing efforts, Toyota induced potential customers to purchase or lease the Class Vehicles by stating, among other things:

> Let's Go Places, Safely.

> Why were 9 Toyota vehicles named "Top Safety Picks" by the Insurance Institute for Highway Safety in 2017?  Because we design them with the knowledge that safety is more than features – it's the lives of the people who drive our cars.

> For us, the journey towards a safe road never ends.  This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people.

125.    An image of this top section of Toyota's website is below.[62]

---

[61]    Jitendra Parashar, "Understanding Toyota's Marketing Strategy," Market Realist,        May        27,        2016,        Available        at http://marketrealist.com/2016/05/understanding-toyotas-marketing-strategy/ (visited January 30, 2020).

[62]        https://www.toyota.com/usa/safety/ (last visited April 17, 2020).



126.    Toyota's    main    website    also    includes    a    page    describing    the
Company's leadership that repeats its consistent and pervasive marketing message
that Toyota vehicles are safe and dependable.  Toyota states: "We build cars and
trucks that help you and your family go places reliably and safely."[63]

127.    Toyota's    website    currently    contains    and    has    contained    these
representations at all relevant times.

128.    Similar representations are on the Lexus website, which is operated by
Toyota.    Lexus.com has a detailed section with many subheadings and tabs
devoted to describing a host of safety features on Lexus vehicles.[64]    While the
standard  availability  of  certain  safety  features  may  vary  on  certain  different
models,  the  overall  consistent  and  pervasive  marketing  message  that  Toyota

---

[63]        https://www.toyota.com/usa/our-story/ (visited January 30, 2020).

[64]        https://web.archive.org/web/20190331073031/https://www.lexus.com/safety
(visited January 30, 2020).

advances through its web marketing for its Lexus Class Vehicles is clearly one of safety and dependability.  For example, the Safety section of the Lexus website in March 2019 stated, "ONE STEP CLOSER TO A WORLD WITHOUT ACCIDENTS.  LEXUS SAFETY.  … At Lexus, we're constantly looking out for the driver.  It's why nearly every new Lexus model comes standard with Lexus Safety System +, a comprehensive suite of active safety equipment."  Similar language remains on the Lexus website as of the time of the filing of this complaint.

129.  This section of the website describes additional safety features equipped in the Class Vehicles,[65] which also appeared on the website in 2018.[66] An example of an image from the Lexus.com safety page as of July 10, 2018 is shown below.  It begins with identical language to that used in 2019, "ONE STEP CLOSER TO A WORLD WITHOUT ACCIDENTS.  LEXUS SAFETY.  … At Lexus, we're constantly looking out for the driver.  It's why nearly every new Lexus model comes standard with Lexus Safety System+, a comprehensive suite of active safety equipment":

---

[65]    https://web.archive.org/web/20190331073031/https://www.lexus.com/safety (visited April 17, 2020).

[66]    https://web.archive.org/web/20180710173356/https://www.lexus.com/safety (visited April 17, 2020).



130.    Toyota likewise touted the safety of older models, including those affected by the Recall.  For example, in 2014, Toyota's website featured pages dedicated to "safety."  Here, Toyota again touted the safety and dependability of its vehicles, stating, "Let's go places, safely."[67]   As seen below, Toyota claimed it designed vehicles "with the knowledge that safety is more than features—it's the lives of the people who drive our cars."[68]

131. Toyota's 2015, 2016, 2017 and 2018 safety marketing materials carried forward its 2014 safety message.[69]

---

[67]

http://web.archive.org/web/20140920203532/http://toyota.com/usa/safety/fast-facts  (last visited April 9, 2020).

[68]    *Id.*

[69]

http://web.archive.org/web/20151006193804/http://www.toyota.com/usa/saf

132. Lexus.com, owned and operated by Toyota, conveyed a similar message. In 2014, Lexus's website stated, "Discover the ways Lexus pursues perfection in everything we do."[70] Here, Lexus also made public its manufacturing policy of the "Pursuit of Perfection."[71]

133. Lexus's 2015 website tracked the 2014 version, carrying forward its message of manufacturing perfection.[72]

134. In 2017, Lexus updated its website to proclaim, "Your safety is a top priority for Leuxs."[73] The website also featured a "performance" page stating that Lexus exhibits "[f]lawless craftsmanship."[74]

135. Lexus's 2018 website further conveys its "safety" focus stating, "At Lexus, we're constantly looking out for the driver.[75]

---

ety/helping-protect-people (last visited April 16, 2020); http://web.archive.org/web/20161006202909/http://www.toyota.com:80/usa/safety/ (last visited April 16, 2020); http://web.archive.org/web/20171223064632/https://www.toyota.com/usa/safety/ (last visited April 16, 2020).

[70] http://web.archive.org/web/20140226063004/http://www.lexus.com/about/ (last visited April 16, 2020).

[71] http://web.archive.org/web/20140324121308/http://www.lexus.com/about/corporate/manufacturing.html (last visited April 16, 2020).

[72] http://web.archive.org/web/20150908063422/http://www.lexus.com/about/corporate/manufacturing.html (last visited April 16, 2020).

[73] http://web.archive.org/web/20170301045625/https://www.lexus.com/ (last visited April 16, 2020).

[74] http://web.archive.org/web/20170606084647/http://www.lexus.com/performance/ (last visited April 16, 2020).

[75] http://web.archive.org/web/20180412233339/https://www.lexus.com/safety

136.   In addition to its representations about Toyota and Lexus vehicles generally, Toyota's website contains specific representations about safety on the pages for specific models of the Class Vehicles.

137.   For example, webpages of various models of the Class Vehicles include multiple photographs and descriptions advertising the safety systems of each of the Class Vehicles.  Those sections list an array of safety features equipped in the Class Vehicles.

138.   Point of sale communications for the Toyota models that are part of the Recall proudly proclaim that the vehicles come standard with the "Star Safety System."  For example, below is a screenshot of the page for the 2019 4Runner, which is part of the Recall.[76]  Here, Lexus also made public its manufacturing policy of the "Pursuit of Perfection," as shown in the screenshot below:[77]

---

(last visited on April 16, 2020).

[76]   https://www.toyota.com/4runner/2019/4runner-features-features/4runner/2019/4runner-features (visited January 30, 2020)

[77]   http://web.archive.org/web/20140324121308/http://www.lexus.com/about/corporate/manufacturing.html (last visited April 16, 2020).



139.    Similarly, below is a screenshot of the Star Safety page for the 2019 Camry:[78]

---

[78]    https://www.toyota.com/camry/2019/camry-features/ (visited January 30, 2020).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



Safety

Smart safety. Helping you drive with confidence.

**Star Safety System™**

Smart tech helps keep you safe. This standard comprehensive suite of six advanced safety features helps keep you out of harm's way. The system includes enhanced Vehicle Stability Control (VSC), [61] Traction Control (TRAC), Anti-lock Brake System (ABS), Electronic Brake-force Distribution (EBD), Brake Assist (BA) [80] and Smart Stop Technology® (SST). [55]

16  140.    The Lexus website makes similar representations about the safety of
17  the individual Lexus models that are part of the Recall.  For example, multiple
18  Class Vehicles' individual pages contain the following statement: "LEXUS
19  SAFETY SYSTEM+* … With an integrated suite of active safety equipment,
20  security comes standard," and go on to list an array of safety features, from airbags
21  to computerized functions.[79]

22
23
24  _____
25  [79]    *See,*                                                              *e.g,*
     https://web.archive.org/web/20180506081936/http://www.lexus.com/models/RX/safety
26                  (visited              April              16,              2020);
     https://web.archive.org/web/20180525081736/http://www.lexus.com/models/NX/safety
27  afety (visited April 16, 2020).
28

141.   For the vehicles included in the Recall, Toyota conveyed identical safety messages.  For example, below is a screenshot of a sales brochure for a 2014 Toyota 4Runner, which is a Class Vehicle:[80]



142.   A car with a defective fuel pump that can cause the engine to stutter or stall while the vehicle is in motion, as do the Class Vehicles, and thereby exposes its occupants to the risk of injury and even death *is not a safe car*.  Thus Toyota's

[80]    https://cdn.dealereprocess.org/cdn/brochures/toyota/2014-4runner.pdf    (last visited April 16, 2020).

marketing of the Class Vehicles as safe is false and misleading and omits facts that would be material to consumers such as Class members who purchased or leased the Class Vehicles because they were consistently marketed as having the utmost safety on the road.

143.   In addition to its representations about safety, Toyota also made false and misleading representations about the durability, power and functioning of the engines of the Class Vehicles.  For vehicles included in the Recall, such as the 2019 Toyota 4Runner, the Toyota webpage touts its "durability," that the 4Runner is "[f]itted to survive," and tells drivers:  "You won't fall short of power." Below is a screenshot of the relevant page from Toyota's website:



144.   Similarly, with respect to the 2018 Lexus RX, the Lexus website touts the vehicle's "exceptionally smooth performance":[81]

---

[81] https://web.archive.org/web/20180513215900/http://www.lexus.com/models/RX/features (visited January 30, 2020).

**THE FEARLESS 2018 RX**

The RX pairs leading-edge technology with exceptionally smooth performance. Meanwhile, the first-ever three-row RXL delivers uncompromised styling with added passenger capacity.

---

145.  Toyota's representations about older vehicles affected by the Recall are consistent with its more recent representations.  For example, below is a screenshot of a sales brochure for a 2014 Toyota FJ cruiser, which is a Class Vehicle:[82]

**ENTICE WITH POWER**

Experience luxury that roars. A 3.5-liter V6 engine with direct and port fuel injection delivers exhilarating power with efficient fuel economy. With 295 horsepower, the RX 350 provides a continuous feeling of acceleration. For even greater control, an innovative dual Variable Valve Timing with intelligence (VVT-i) system offers precise engine performance as it reduces emissions and enhances fuel efficiency. VVT-i monitors the engine's speed and load, increasing torque at lower speeds for improved acceleration, and boosts performance at higher speeds by adjusting intake and exhaust valve timing.

---

[82]   https://cdn.dealereprocess.org/cdn/brochures/toyota/2014-fjcruiser.pdf   (last visited April 16, 2020).

- 48 -

146. As with Toyota's representations about the safety of the Class Vehicles, these and similar representations about their performance are false and misleading.[83]  Toyota's representations that "you won't fall short of power," and that the Lexus has an "exceptionally smooth performance," are false and misleading because, as Toyota admits by virtue of the Recall, the Class Vehicles are unsafe and do not perform as advertised as they are prone to the Fuel Pump Defect that can lead to rough running, engine hesitation and stalling while the vehicle is in motion, and render the Class Vehicles inoperable while on the road.

147. Similar representations to those that Toyota made about the Toyota and Lexus vehicles included above are also included in Toyota's marketing about the other Class Vehicles.

148. Toyota's marketing of the Class Vehicles conveys a clear, uniform and pervasive message that the Class Vehicles are to be equated with safety and dependability.  Safety and dependability are material to consumers when purchasing or leasing a vehicle, and, as the content of Toyota's marketing makes clear, are a big if not the biggest factor driving consumers' decision to purchase or lease their Class Vehicles.

149. Toyota marketed the Class Vehicles as safe and dependable, however it failed to disclose the impact and danger of the Fuel Pump Defect and/or that the Class Vehicles were not safe or dependable.  Specifically, Toyota:

    a.    Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Fuel Pump Defect, despite its knowledge;

---

[83] https://web.archive.org/web/20180513215900/http://www.lexus.com/models/RX/features (visited April 17, 2020).

b.    Failed to disclose, at and after the time of purchase, lease, and/or service, that the Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

c.    Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

150.    Toyota's deceptive marketing and willful and knowing failure to disclose the Fuel Pump Defect damaged, and continues to damage, Plaintiffs and Class members.  If Plaintiffs and Class members had known of the Fuel Pump Defect and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would have paid less to do so.

## VI.    TOYOTA ADMITTED THE FUEL PUMP DEFECT WAS DANGEROUSLY DEFECTIVE, BUT ISSUED AN INADEQUATE RECALL

151.    On January 13, 2020, Toyota instituted the Recall, a voluntary safety recall of 695,541 vehicles, admitting that the defective Fuel Pump prematurely fails, compromising consumer safety.

152.    On the same date, Toyota issued an alert entitled, "Toyota is conducting a safety recall involving certain Toyota and Lexus vehicles."[84] There Toyota also acknowledged:

The subject vehicles are equipped with a fuel pump which may stop operating. If this were to occur, warning lights and messages may be displayed on the instrument panel, and the engine may run rough. This can result in a vehicle stall, and the vehicle may be unable to be

---

[84]    *See*    https://pressroom.toyota.com/toyota-is-conducting-a-safety-recallinvolving-certain-toyota-and-lexus-vehicles-2/  (last visited April 9, 2020).

restarted. If a vehicle stall occurs while driving at higher speeds, this could increase the risk of a crash.[85]

153.   The scope of the Recall has since been expanded to cover 695,541 vehicles to 1,830,752 vehicles.

154.   In connection with the Recall, Toyota identified as the root cause a plastic impeller which deforms or swells due to fuel absorption.

155.   In a press release that was not targeted to consumers in North America, Toyota Australia admitted that, world-wide, Toyota and Lexus vehicles with the subject Fuel Pumps had the same issue and that the production process was changed in April 2019 specifically to improve the impeller.

156.    By instituting the Recall, Toyota admitted the Fuel Pump Defect is a serious safety defect that could lead to a crash, which can result in serious injury or death.

157.   The Recall is inadequate to the extent that it does not include all the Class Vehicles.

158.   Toyota limited the Recall to a subset of the Class Vehicles that are equipped with the Fuel Pumps. The Recall omits other Class Vehicles equipped with the same defective Fuel Pumps.

159.   Although a majority of Toyota's Hybrid variant Class Vehicles are not included in the Recall, Toyota admits in both the First DIR and the Second DIR that these Class Vehicles also are equipped with the same Fuel Pump.  These Hybrid variant Class Vehicles also experience the Fuel Pump Defect and should have been included in the Recall.

160.   For example, on carcomplaints.com, an owner of a 2018 Toyota Camry Hybrid stated about their vehicle:

---

[85]      *Id.*

The vehicle did not respond properly to the driver pressing the accelerator. When the driver attempted to drive the vehicle after it had been parked for a few hours, with no problems previously, *the vehicle would barely accelerate*. The vehicle felt very sluggish and even with the accelerator fully pressed it would not exceed 25 mph. The driver pulled the vehicle over and turned off the vehicle and turned it back on but this did not immediately resolved the issue. The driver drove the vehicle for a few blocks to a safer parking location and turned off the vehicle again to better inspect the vehicle. *There were no warnings on the instrument panel and no obvious signs of mechanical issues*. The driver restarted the vehicle and attempted to drive it again the issue did not re-appear. This vehicle had not yet been inspected by the dealership since the incident but *could have resulted in a tragic collision and needs to be addressed*.[86]

161.  Another owner of a 2018 Toyota Camry Hybrid voiced a similar account:

The contact owns a 2018 Toyota Camry hybrid. While driving at lower speeds in both drive and reverse*, the vehicle would hesitate and jerk*. The contact indicated that the failure was more severe while driving in very cold weather temperatures and when the engine was not warmed up. In addition, *the braking distance was extended when the brake pedal was depressed*. The vehicle was taken to the local dealer (crestmont Toyota, 730 NJ-23, pompton plains, New Jersey) where the failure was able to be duplicated, but indicated that the

---

[86]

http://m.carcomplaints.com/Toyota/Camry_Hybrid/2018/engine/vehicle_speed_control.shtml (last viewed April 17, 2020) (emphasis added).

vehicle was operating as designed. The manufacturer was also notified
and the contact was referred back to the dealer. The failure mileage
was 1,000.[87]

162.    Omission of these Hybrid variants from the Recall is improper, as
Toyota had ample knowledge of the defect's existence in these vehicles.

163.    Toyota manufactured other vehicles with the Fuel Pump Defect but
did not include them in the Recall.  For example, Plaintiff Gendron owns a 2018
Lexus GX460 that is, upon information and belief, equipped with the same Fuel
Pump that is in other Class Vehicles that are included in the Recall.  Nevertheless,
her Class Vehicle is excluded from the Recall.

164.    Despite issuing the Recall, Toyota has not notified all the owners and
lessees of Class Vehicles included in the Recall of the Fuel Pump Defect.  Toyota
acknowledged the defect and the serious safety consequences it poses on January
13, 2020, and again on March 4, 2020, by submitting the First and Second DIRs.
However, as Toyota stated in the First DIR, it would not notify owners included in
the first wave until March 13, 2020.[88]  Toyota expects to notify owners and lessees
of Class Vehicles added to the Recall by May 3, 2020.[89]   Thus, while Toyota
knows the Fuel Pump Defect can result in collision and serious injury, its apparent
strategy is to delay directly notifying consumers about the dangerous defect until
months after it acknowledged the same to NHTSA.

165.    Toyota states it will replace the Fuel Pump with a new fuel pump with
a new one, however, the new fuel pump is not currently available.  This means

---

[87]

   http://m.carcomplaints.com/Toyota/Camry_Hybrid/2018/engine/engine.shtml (last visited April 17, 2020) (emphasis added).

[88]    Exhibit A.

[89]    Exhibit C.

Toyota is knowingly and intentionally permitting Toyota and Lexus vehicles with the dangerous Fuel Pump Defect to be driven by its customers throughout the United States, including in California.  There is also no guarantee that a corrective remedy will be available or effective.  Toyota has only offered estimated rollout dates when a remedy might become available.

166.   Consumers have continued to raise concerns after the announcement of the Recall.

167.   For example, on January 16, 2020, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> ***Fuel pump stops working while driving on highway at high speeds,*** vehicle rides rough intermittently then shuts down. Vehicle will not start up again.[90]

168.   On January 24, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA, expressly complaining about the dangerous lack of recall remedy, and stating that the owner had been forced to "park" the car in the absence of a remedy:

> First incident occurred in Dec 2019 and then again in Jan 2020. ***While driving engine lost power and vehicle began lurching forward and back uncontrollably***. After pulling over engine shut down. ***Thankfully we did not cause an accident***. Check engine light came on, also said reduced engine power and traction control off. First time dealer said it was bad gas. Second time they tested fuel pump and it was producing 5 psi. Way below 50-60 psi norm. ***Now our vehicle is parked waiting for Toyota to develop a fix for their fuel pump.*** No

---

[90]    NHTSA Complaint ID No. 11299706 (emphasis added).

idea how long that will take. Our car is part of the almost 700,000 Toyota recalled. Toyota used to mean quality, not sure any more.[91]

169.    On March 18, 2020, the owner of a 2019 Lexus RX350 filed the following complaint with NHTSA complaining about the adequacy of the Recall:

Tl* the contact owns a 2019 Lexus RX350. The contact received notification of NHTSA campaign number: 20v012000  (fuel system, gasoline) however, *the part to do the recall repair was not yet available. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair.* The contact stated that dch Lexus of oxnard (located at  1640  auto center dr, oxnard, ca 93036), exceeded a reasonable amount of time for the recall repair. The manufacturer was made aware of the issue. The contact had not experienced a failure. Parts distribution DISCONNECT.[92]

170.    On April 1, 2020, the owner of a 2018 Toyota Tacoma filed the following complaint with NHTSA expressly complaining about the inadequacy of the Recall:

I have a 2018 Toyota Tacoma with an open recall on the fuel pump. The safety risk is that the vehicle may stall at higher speeds. This recall came out in January 13, 2020, but there still isn't a remedy to the issue. My daily commute is on the highway approximately 40 miles one way. I feel very unsafe in my Toyota Tacoma as this vehicle is my daily driver. It is now April 1, 2020 and Toyota has yet to release any fix or remedy to correct this safety recall. How long does

---

[91]    NHTSA Complaint ID No. 11301691 (emphasis added).

[92]    NHTSA Complaint ID No. 113186526 (emphasis added).

Toyota have to remedy the issue and what are my options at this point with the vehicle?[93]

171.  Although Toyota knows about the grave dangers posed by the Fuel Pump Defect, Toyota has not indicated that it intends to take the vehicles off the road—even temporarily—or enable Class members to stop driving the dangerous vehicles until (if ever) there is a repair by contacting them directly, through Toyota dealers, which are Toyota's agents, or state vehicle registry lists or otherwise, and offering them free loaner vehicles of comparable make, model, or value to the Class Vehicle they own or lease.  Thus, Toyota is knowingly exposing at least 1.83 million of its customers to danger.

172.  Therefore, the Recall is inadequate.  It fails to promptly alert Class members to the admittedly dangerous Fuel Pump Defect and provide them with a safe alternative, which inevitably will lead to more Fuel Pump failures, and possibly injury or death. The Recall also fails to include all the Class Vehicles equipped with the Fuel Pump.  Moreover, there is no indication the repair will be executed anytime soon or whether it will be effective.  These actions are deceitful, unconscionable, and expose Class members to injury and death. In addition to these dangers, Toyota's actions have deprived purchasers and lessees of the Class Vehicles of the benefit of their bargain.

## VII.  APPLICABLE WARRANTIES

173.  Toyota sold and leased the Class Vehicles with written express warranties.

174.  For the Toyota branded Class Vehicles, Toyota offered a written express basic warranty covering Toyota brand vehicles for 36 months or 36,000

---

[93]  NHTSA Complaint ID No. 11319988.

miles covering all components (except normal wear and tear). Toyota also offered a 60 month or 60,000 miles powertrain warranty.

175. For the Lexus branded Class Vehicles, Toyota offered a written express Limited Warranty of four years or 50,000 miles. Toyota also offered a six-year 70,000 miles powertrain warranty.

176. Toyota provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

177. Toyota admitted a breach of these warranties when it reported in the DIRs that it did not have a repair or remedy for the defective Fuel Pump. Class members complain to dealers about the Fuel Pump Defect but do not receive an adequate repair, breaching the express and implied warranties provided by Toyota.

## VIII. FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS

178. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Toyota and Denso responsible for making false and misleading statements regarding the Class Vehicles. Toyota and Denso are in possession of such information. Plaintiffs' claim arise out of Defendants' fraudulent omission/concealment of the Fuel Pump Defect, despite their representations about the quality, safety, and comfort of the Class Vehicles.

179. At all relevant times, including specifically at the time Plaintiffs and Class members purchased and/or leased their Class Vehicles, Defendants knew, or were reckless in not knowing, of the Fuel Pump Defect; Defendants had a duty to disclose the Fuel Pump Defect based upon their exclusive knowledge; and Defendants never disclosed the Fuel Pump Defect to Plaintiffs or the public at any time or place in any manner other than in connection with the Recall.

180.    Defendants actively concealed and omitted the Fuel Pump Defect from Plaintiffs and Class members while simultaneously touting the safety of the Class Vehicles, as alleged herein.  Plaintiffs are unaware of and, therefore, unable to identify, the true names and identities of the specific individuals at Defendants responsible for such decisions.

181.    Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein.  Defendants concealed and omitted the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles.

182.    Defendants concealed and omitted material information regarding the Fuel Pump Defect at all times while making representations about the safety and dependability of the Class Vehicles on an ongoing basis, as alleged herein. Defendants still have not disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Defendants have never taken any action to inform consumers about the true nature of the Fuel Pump Defect.

183.    Defendants concealed and omitted material information regarding the true nature of the Fuel Pump Defect in every communication they had with Plaintiffs and Class members and made representations about the quality, safety, and comfort of the Class Vehicles.   Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites.  There are channels through which Defendants could have disclosed the full scope of the Fuel Pump Defect, however, they elected no to do so.

184. Defendants actively concealed and omitted the truth about the existence, scope, and nature of the Fuel Pump Defect from Plaintiffs and Class members at all times, even though it knew about the Fuel Pump Defect and knew that information about the Fuel Pump Defect would be important to a reasonable consumer, and Toyota promised in its marketing materials that Class Vehicles have qualities that they do not have.

185. Defendants actively concealed and omitted to disclose material information about the Fuel Pump Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase and/or lease Class Vehicles, rather than purchasing and/or leasing competitors' vehicles. Had Defendants disclosed the truth in its advertisements or other marketing material or communications, Plaintiffs and Class members would have not bought or leased the Class Vehicles or would not have paid as much for them.

## IX.    TOLLING THE STATUTE OF LIMITATIONS

### A.    Continuing Act Tolling

186. Beginning in 2013, Toyota continuously marketed and sold the Class Vehicles to unsuspecting customers. It continuously represented the Class Vehicles as safe and dependable despite their propensity to lose fuel pressure, hesitate under acceleration and/or experience engine shutdown. By making these false representations, failing to disclose the existence of the Fuel Pump Defect, and thereby exposing occupants to risk of injury and death, Toyota engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Toyota might seek to apply.

187. Pursuant to the TREAD Act, 49 U.S.C. § 30118, manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects. Toyota owes a continuing duty to Plaintiffs

and Class members to disclose to any safety risks that its products pose. It continually breached that duty.

188.   Toyota breached its duty by selling the Class Vehicles without disclosing the Fuel Pump Defect.

189.   Toyota's knowledge of the Fuel Pump Defect is evidenced by, among other things, numerous NHTSA complaints by consumers, many of whom reported contacting Toyota directly about the Defective Fuel Pump.   Other NHTSA complainants reported taking their vehicles to Toyota's dealers, who are agents of Toyota and report consumer complaints back to Toyota.

190.   Thus, Plaintiffs' and Class members' claims are not time barred.

**B.    Fraudulent Concealment Tolling**

191.   Toyota had a duty to disclose to Plaintiffs and the Class members the true quality and nature of the Class Vehicles, that the Class Vehicles had uniform defect; and that the Fuel Pump Defect requires repairs, poses a safety risk, and reduces the intrinsic and resale value of the affected vehicles. *See* TREAD Act, 49 U.S.C. § 30118.

192.   Toyota knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein.  Toyota concealed and omitted to disclose the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles.

193.   Despite its knowledge of the Fuel Pump Defect, Toyota failed to disclose and concealed this material information from Plaintiffs and other Class members, and instead continued to market the Class Vehicles as safe and durable.

194.   The purpose of Toyota's concealment of the Defective Fuel Pump was to prevent Plaintiffs and other Class members from seeking redress.

195.   Plaintiffs and the other Class members justifiably relied on Toyota to disclose the existence of dangerous defects, including the Fuel Pump Defect, in the

Class Vehicles that they purchased or leased, because that defect was not discoverable by Plaintiffs and the other Class members through reasonable efforts.

196.    Any applicable statute of limitations is tolled by Toyota's knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

### C.    Discovery Rule Tolling

197.    Even through the exercise of reasonable diligence, Plaintiffs and other Class members could not have discovered, prior to Toyota's issuance of the First DIR on January 13, 2020 and/or the subsequent DIRs on March 4, 2020 and March 19, 2020, that Toyota was concealing and misrepresenting the existence of the Fuel Pump Defect in Class Vehicles and the risks such defect posed.

198.    Plaintiffs and the other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Toyota failed to disclose material information within its knowledge about a dangerous defect to consumers worldwide.

## X.    CLASS ACTION ALLEGATIONS

199.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

200.    Plaintiffs seek to represent a California statewide class ("California Class") defined as follows:

> **All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of California.**

201.    Plaintiffs also seek to represent a class ("Nationwide Class") defined as:

**All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the United States.**

202.   Excluded from the California and Nationwide Classes ("Classes") are Toyota and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.   Plaintiffs reserve the right to modify or amend definitions of the Classes, and to add additional classes and sub-classes, as appropriate, during the course of this litigation.

203.   This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

204.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**   The members of the Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable.   While Plaintiffs are informed and believe that there are not less than at least approximately 700,000 members of the Classes, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Toyota's books and records.   Nationwide and California Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

205.   **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**   This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

        a.     whether Defendants engaged in the conduct alleged herein;

        b.     whether Defendants' alleged conduct violates applicable law;

c.      whether Toyota designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d.      whether Toyota made false or misleading statements about the quality and safety of the Class Vehicles;

e.      whether the Class Vehicles contain the Fuel Pump Defect;

f.      whether Defendants had actual or implied knowledge about the alleged defect but failed to disclose it to Plaintiffs and the other members of the Classes;

g.      whether Defendants' omissions and concealment regarding the quality of the Class Vehicles were likely to deceive the California Class members in violation of the state consumer protection statutes alleged herein;

h.      whether Toyota breached its express warranties with respect to the Class Vehicles;

i.      whether Toyota breached its implied warranties with respect to the Class Vehicles;

j.      whether the members of the Classes overpaid for their Class Vehicles as a result of the defect alleged herein;

k.      whether the members of the Classes are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

l.      the amount and nature of relief to be awarded to Plaintiffs and the other members of the Classes.

206.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other members of the Classes because Plaintiffs and the members of the Classes purchased or leased Class Vehicles that

contain defective Fuel Pumps, as described herein.  Neither Plaintiffs nor the other members of the Classes would have purchased the Class Vehicles, or would have as much as they did for the Class Vehicles, had they known of the Fuel Pump Defect.  Plaintiffs and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

207.  **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes that they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

208.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Toyota has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and California Class members as a whole.

209.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Toyota, so it would be impracticable for the other members of the Classes to individually seek redress for Toyota's

wrongful conduct. Even if these Class members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device, as intended by Congress, presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT,
### Cal. Civ. Code §§ 1750, *et seq.*

(Individually and on Behalf of the Nationwide Class and, alternatively, on behalf of the California Class Against all Defendants)

210.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

211.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class and, alternatively, on behalf of the California Class.

212.    Defendants are "persons" as defined by California Civil Code § 1761(c).

213.    Plaintiffs and the California Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased Class Vehicles for personal, family, or household use.

214.    The sale of the Class Vehicles to Plaintiffs and the putative Class members is a "transaction" as defined by California Civil Code § 1761(e).

215.    Defendants' acts and practices, which were intended to result, and which did result, in the sale of the Class Vehicles, violate § 1770 of the Consumers Legal Remedies Act ("CLRA") for at least the following reasons:

- 65 -

a.    Defendants represented that the Class Vehicles have characteristics, uses or benefits which they do not have;

b.    Defendants advertised their goods with intent to not sell them as advertised;

c.    Defendants represented that their products are of a particular standard, quality, or grade when they are not; and

d.    Defendants represented that their goods have been supplied in accordance with a previous representation when they have not.

216.    By failing to disclose and concealing the defective nature of the Class Vehicles from Plaintiffs and the prospective class members, Defendants violated California Civil Code § 1761(a), as they represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles and their engine components were of a particular standard, quality, or grade when they were of another.  *See* Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

217.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

218.    Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.  The Fuel Pump Defect is in each of the Class Vehicles at purchase or lease but may have not been discovered by putative class members until months, or years, after the purchase.  Indeed, Defendants knew, or should have known, well in advance of the Recall that the Class Vehicles contained the Fuel Pump Defect which presents a substantial danger of bodily injury or death.

219.   As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Fuel Pump Defect, Plaintiffs and the California Class members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

220.   Defendants were under a duty to Plaintiffs and the California Class members to disclose the defective nature of the Class Vehicles and/or associated repair costs because Defendants were in a superior position to know the true state of facts about the Fuel Pump Defect in the Class Vehicle and Plaintiffs and California Class members could not reasonably have been expected to learn or discover that their vehicles had a dangerous safety defect until it manifested.

221.   In failing to disclose the defective nature of the Class Vehicles prior to January 2020, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

222.   A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiffs and the California Class members to be material in deciding whether to purchase or lease the Class Vehicles or pay less for them.  Had Plaintiffs and the California Class members known of the defective nature of the Class Vehicles, they would not have purchased or leased said vehicles or would have paid less for them.

223.   Plaintiffs and the California Class members are reasonable consumers who do not expect their vehicles to suddenly accelerate, decelerate, or stall without warning and while underway.  This is the reasonable and objective consumer expectation relating to consumer automobiles.

224.   As a result of Defendants' conduct, Plaintiffs and the California Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience the Fuel Pump Defect and the resultant effects therefrom.

225.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiffs and California Class members suffered and will continue to suffer actual damages.  Had Defendants disclosed the true nature and/or danger in its vehicles, Plaintiffs and members of the California Class would not have been misled into purchasing the Class Vehicles or would have paid significantly less for them.

226.   Plaintiffs, on behalf of themselves and all other similarly situated California consumers, and as appropriate, on behalf of the general public of the State of California, seek injunctive relief prohibiting Defendants from continuing these unlawful practices pursuant to California Civil Code § 1782(a)(2), and such other equitable relief, including restitution of either (1) the full purchase or lease price paid by customers who purchased a Class Vehicle, or (2) a portion of the purchase or lease price paid by customers who purchased or leased a Class Vehicle reflecting the difference in value as compared to a vehicle without the defect.

227.   Plaintiffs provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) via certified mail, attached hereto as Exhibit F, demanding that Defendants correct such violations. If Defendants fail to respond to the letter within 30 days Plaintiffs will amend their complaint to seek damages and attorneys' fees as allowed by the CLRA.

/ / /

/ / /

/ / /

**COUNT II**

**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT
Cal. Civ. Code §§ 1790, *et seq*.**

(Individually and on Behalf of the California Class Against Toyota)

228.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

229.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the California Class as a result of Toyota's breach of its express and implied warranties.

230.   Each of the Plaintiffs is a buyer as Civil Code section 1791, subdivision (b), defines the term "buyer."

231.   The Class Vehicles are consumer goods, as Civil Code section 1791, subdivision (a), defines the term "consumer good."  The Class Vehicles are new motor vehicles, as Civil Code section 1793.22, subdivision (e)(2), defines the term "new motor vehicle."

232.   Toyota was, at all times relevant hereto, the manufacturer, distributor, warrantor, lessor, and/or seller of the Class Vehicles.  Toyota knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

233.   Plaintiffs leased Class Vehicles from Toyota and Toyota provided Plaintiffs and California Class members with a standard express written warranty covering the Class Vehicles which states, in part, that:

> Toyota:  Basic Coverage is 36 months/36,000 miles, whichever occurs first, from the date of first use and covers all components other than normal wear and maintenance items. This warranty covers repairs and adjustments needed to correct defects in materials or workmanship or any part supplied by Toyota, subject to exceptions.

Powertrain Coverage is 60 months/60,000 miles, whichever occurs first, from the date of first use and includes engine, transmission/transaxle, front-wheel-drive system and rear-wheel drive system.

<u>Lexus</u>:  The Basic Warranty coverage is for 48 months or 50,000 miles, whichever occurs first.

The Powertrain Warranty is for 72 months or 70,000 miles, whichever occurs first. Except for the situations listed on the Basic Warranty page, this warranty covers repairs needed to fix defects in materials or workmanship of any component listed below:

ENGINE

Cylinder block and head and all internal parts, timing belt and cover, flywheel, oil pan, water pump, fuel pump, engine mounts, engine control computer, seals and gaskets …

234.   Toyota is unable to conform Class Vehicles to its express warranty as they have no fix for the Fuel Pump Defect.  Toyota is only prepared to temporarily replace Plaintiffs' Class Vehicles with ones of inferior quality while insisting that they continue to make full lease payments on Class Vehicles they cannot safely operate and ones that cannot be made to conform to Toyota's express warranty.

235.   Plaintiffs and the California Class members were harmed because they purchased or leased the Class Vehicles and paid the full purchase or lease price of those vehicles but were unable to use such Class Vehicles due to the Fuel Pump Defect.   Temporary loaner vehicles to be provided to Plaintiffs and California Class members are not of the same quality as the Class Vehicles purchased or leased and Plaintiffs and the Class members suffered substantial

economic injury and other harm as they were deprived of the benefit of the bargain that they struck with Toyota.

236.  Toyota's failure to equip the Class Vehicles with an appropriate and reliable fuel pump, and failure to repair the Fuel Pump Defect such that the Class Vehicles conform to the express warranty, is a substantial factor in Plaintiffs' and California Class members' harm.

237.  Toyota is unable to conform the Class Vehicles to the express warranties despite being afforded a reasonable opportunity to do so.  Toyota will not replace the Class Vehicles or refund the purchase price and/or lease payments. Rather, Toyota insists that Plaintiffs and California Class members continue making payments on inoperable Class Vehicles.

238.  Since being informed of the defect in the Class Vehicles, neither Plaintiffs nor Class members have been able to safely drive their Class Vehicles as the Fuel Pump Defect is likely to cause death or serious injury if it fails while the Class Vehicles are being operated.

239.  Under the Song-Beverly Consumer Warranty Act, all express warranties are accompanied by the implied warranty of merchantability, which may not be disclaimed by the manufacturer or retail seller.

240.  Toyota provided Plaintiffs and the California Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they are sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, among other things, the Class Vehicles suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

241. Toyota impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (1) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (2) a warranty that the Class Vehicles would be fit for their intended use while they were being operated.

242. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the California Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective.

243. Toyota's breach of express and implied warranties was willful and has deprived Plaintiffs and the California Class members of the benefit of their bargain.

244. Toyota has had multiple reasonable opportunities to cure the breach, but either cannot or will not do so due to conditions reasonably within its control. Pursuant to the Song-Beverly Consumer Warranty Act, if the manufacturer is unable to conform a New Motor Vehicle to the express warranty, then the manufacturer shall promptly replace the vehicle with one that conforms to the express warranty or reimburse the buyer. Toyota has done neither despite being informed that the Class Vehicles are defective and do not conform to applicable warranties.

245. On April 20, 2020, Plaintiffs Gendron and Carter Defendants a letter informing them of their statutory consumer protection and warranty claims under California law. *See* Exhibit F.

246.   Toyota's breach of express and implied warranties was willful and has deprived Plaintiffs and the California Class members of the benefit of their bargain.

247.   As a direct and proximate cause of Toyota's breach of express and implied warranties, Plaintiffs and the California Class members sustained damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiffs and the California Class members, who are entitled to recover under section 1794 of the act, including civil penalties, actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other such relief the Court deems appropriate.

## COUNT III
## VIOLATION OF THE FALSE ADVERTISING LAW
### California Bus. & Prof. Code §§ 17500, *et seq.*

(Individually and on Behalf of the Nationwide Class and, alternatively, on behalf of the California Class Against All Defendants)

248.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

249.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class and, alternatively, on behalf of the California Class.

250.   Toyota has benefitted from intentionally selling and leasing at an unjust profit defective Class Vehicles at artificially inflated prices due to Defendants' concealment of the Fuel Pump Defect, and Plaintiffs and other California Class members overpaid for their Class Vehicles.

251.   Toyota publicly disseminated advertising and promotional material that was designed and intended to convey to the public that the Class Vehicles

were safe, reliable, and operated as consumers would expect the Class Vehicles to operate.

252.   Defendants were aware, or should have been aware, of the Fuel Pump Defect at the time Plaintiffs and California Class members purchased or leased the Class Vehicles.

253.   However, Toyota negligently or intentionally made representations in its advertisements, and, due to issues it was aware of, did not sell the Class Vehicles that conformed to the representations and promises in the publicly disseminated advertisements.

254.   Toyota unjustly received and retained benefits from Plaintiffs and the other California Class members.

255.   It is inequitable and unconscionable for Toyota to retain these benefits.

256.   Because Defendants wrongfully concealed their misconduct, Plaintiffs and California Class members were not aware of the facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

257.   Toyota knowingly accepted the unjust benefits of its wrongful conduct.

258.   As a result of Toyota's misconduct, Plaintiffs and California Class members suffered an injury-in-fact and lost money and/or property in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

/ / /

- 74 -

**COUNT IV**
**VIOLATION OF THE UNFAIR COMPETITION LAW**
**Cal. Civ. Code §§ 17200, *et seq.***

(Individually and on Behalf of the Nationwide Class and, alternatively, on behalf of the California Class Against All Defendants)

259. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

260. Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class and, alternatively, on behalf of the California Class.

261. As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value in connection with the purchase or lease of their Class Vehicles. Additionally, as a result of the Fuel Pump Defect, Plaintiffs and members of the California Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

262. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

263. Plaintiffs and members of the California Class are reasonable consumers who do not expect their vehicles to suffer from sudden acceleration, deceleration, and stalling without warning.

264. Defendants knew the Class Vehicles suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

265. In failing to disclose the Fuel Pump Defect, Defendants' knowingly or intentionally concealed material facts and breached their duty not to do so.

- 75 -

266.    Defendants were under a duty to Plaintiffs and members of the California Class to disclose the Fuel Pump Defect because Defendants were in a superior position to know the true state of facts about the safety defect and Plaintiffs and members of the California Class could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until it manifested.

267.    A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiffs and members of the California Class to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them. Had Plaintiffs and members of the California Class known of the Fuel Pump Defect in the Class Vehicles, they would not have purchased or leased the vehicles or would have paid less for them.

268.    Defendants continued to conceal the defective nature of the Class Vehicles even after consumers began to report problems.  Defendants continue to cover up and conceal the true nature of the Fuel Pump Defect.

269.    Defendants' acts, conduct, and practices were fraudulent, in that they constituted business practices and acts that were likely to deceive reasonable members of the public.  Defendants' acts, conduct, and practices were fraudulent because they are immoral, unethical, oppressive, unscrupulous, and/or are substantially injurious to consumers.

270.    Defendants' acts, conduct, and practices were unfair in that they constituted business practices and acts the utility of which does not outweigh the harm to consumers.  Defendants' business acts and practices were further unfair in that they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

271.  A business practice is unlawful if it is forbidden by any law. Defendants' acts, conduct, and practices were unlawful, in that they constituted:

a.  Violations of the California Consumers Legal Remedies Act;

b.  Violations of the Song-Beverly Consumer Warranty Act;

c.  Violations of the False Advertising Law;

d.  Violations of Magnuson-Moss Consumer Warranty Act; and

e.  Violations of the express and implied warranty provisions of California Commercial Code sections 2313 and 2314.

272.  By its conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

273.  Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

274.  As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and members of the California Class have suffered and will continue to suffer actual damages.

275.  Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and members of the California Class pursuant to §§ 17203 and 17204 of the Business & Professions Code.  Plaintiffs and members of the Classes also seek injunctive relief as deemed appropriate by the Court.

**COUNT V**
**NEGLIGENCE**

(Individually and on Behalf of the California and Nationwide Classes

Against Toyota)

276.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

277.  Plaintiffs bring this cause of action on behalf of themselves and on behalf of the California and Nationwide Classes.

278.  Toyota owed a duty to Plaintiffs and members of the Classes to provide a vehicle that conformed with its publicly disseminated representations, its warranties, and promotional information given to Plaintiffs and members of the Classes at the time of their respective transactions.

279.  Toyota harmed Plaintiffs and members of the Classes by negligently designing, testing, engineering, and incorporating the Fuel Pump into the Class Vehicles.

280.  Toyota's negligence was a substantial and necessary factor in causing Plaintiffs and members of the Classes harm, and it was foreseeable by Toyota that Plaintiffs and members of the Classes would be harmed by negligently designing, testing, engineering, and incorporating the Fuel Pump into the Class Vehicles.

281.  As a result of Toyota's negligence, Plaintiffs and members of the Classes are entitled to recover damages in an amount to be proven at trial, and such other relief as the Court may deem appropriate.

## COUNT VI
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
## 15 U.S.C. §§ 2301, *et seq.*

(Individually and on Behalf of the Nationwide Class Against Toyota)

282.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

283.  Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class.

284.  This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

285.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

286.   Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

287.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

288.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

289.   In its express written warranties, Toyota expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

290.   Toyota's warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

291.   With respect to Nationwide Class members' purchases or leases of the Class Vehicles, the terms of Toyota's written warranties and implied warranty became part of the basis of the bargain between Toyota and Plaintiffs and other Nationwide Class members.

292.   Toyota breached the implied warranty of merchantability.  Without limitation, the Class Vehicles have Fuel Pumps that prematurely fail, as described above, which renders the Class Vehicles unmerchantable.

293.   Toyota breached its express warranties by not offering a functioning repair for the Fuel Pump in the Class Vehicles as evidenced by Toyota's own admission in the DIRs that it has not identified a remedy.

294.   Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement

futile.   As stated above, Nationwide Class members have reported Fuel Pump
failures to their dealers, but Toyota has failed to repair the Fuel Pump Defect.

295.   At the time of sale or lease of each of the Class Vehicles, Toyota
knew, should have known, or was reckless in not knowing of the Class Vehicles'
inability to perform as warranted, but nonetheless failed to rectify the situation
and/or disclose the Fuel Pump Defect.

296.   The amount in controversy of each of Plaintiffs' individual claims
exceeds the sum of $25.  The amount in controversy in this action exceeds the sum
of $50,000, exclusive of costs and interest, computed on the basis of all claims to
be determined in this lawsuit.

297.   Plaintiffs, individually and on behalf of the Nationwide Class
members, seek all damages permitted by law, including diminution in value of
their Class Vehicles, in an amount to be proven at trial.

## XII.   REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request relief against Defendants as
set forth below:

1.     Certifying the proposed Nationwide and California Classes;

2.     Appointing Plaintiffs as the Class representatives and Wolf
Haldenstein Adler Freeman & Herz LLP as Class counsel;

3.     Ordering Defendants to pay actual and statutory damages (including
punitive damages) and restitution to Plaintiffs and the other Class members, as
allowable by law;

4.     Enjoining Defendants from continuing the unfair business practices
alleged in this Complaint;

5.     Ordering Defendants to pay both pre- and post-judgment interest on
any amounts awarded;

1    6.    Ordering Defendants to pay attorneys' fees and costs of suit;

2    7.    Awarding injunctive relief requiring Toyota promptly and fully

3 inform Class members of the Fuel Pump Defect and its associated dangers and

4 instructing such Class members to cease driving their vehicles, and ordering

5 Toyota provide free loaner vehicles of the type of Class Vehicle each Class

6 member owns or leases until a remedy for the Fuel Pump Defect is installed in the

7 Class Vehicles; and

8    8.    Granting such additional relief as the Court deems just and proper.

9                         **JURY TRIAL DEMANDED**

10    Plaintiffs demand a jury trial on all issues so triable.

11 Dated: April 20, 2020              **WOLF HALDENSTEIN ADLER**
12                                   **FREEMAN & HERZ LLP**

13                         By:    _____/s/ Rachele R. Byrd_____
14                                   RACHELE R. BYRD

15                                RACHELE R. BYRD
16                                MARISA C. LIVESAY
17                                BRITTANY N. DEJONG
                                 750 B Street, Suite 1820
18                                San Diego, CA 92101
                                 Telephone:  619/239-4599
19                                Facsimile:  619/234-4599
                                 byrd@whafh.com
20                                livesay@whafh.com
                                 dejong@whafh.com
21
22                                **WOLF HALDENSTEIN ADLER**
                                  **FREEMAN & HERZ LLP**
23                                MALCOLM T. BROWN
                                 270 Madison Ave.
24                                New York, New York 10016
                                 (212) 545-4600
25                                brown@whafh.com
26                                *Attorneys for Plaintiffs*
27 26404
28                                   - 81 -